**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **DANIELLE DREBING,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   No. 05 C 5480 |
| | ) |
| **THE PROVO GROUP, INC.**, et al., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Danielle Drebing ("Drebing")[1] brought a claim under Title VII of the Civil Rights Act of 1964 alleging that defendants The Provo Group, Inc. ("The Provo Group"), TPG Management, Inc. ("TPG Management"), and Evergreen Plaza Associates I, L.P. ("Evergreen Plaza")[2] terminated her and created a hostile work environment because she is a woman and was pregnant. The Provo Group and TPG Management seek summary judgment, contending that they did not have enough employees during the relevant time period to trigger Title VII, and in the alternative argue that Drebing was terminated for insubordination. Evergreen Plaza has filed its own motion for summary judgment, arguing that Drebing did not name Evergreen Plaza in her EEOC charge, Drebing's claims are time-

---

[1] Drebing's maiden name was DeHaan, and certain of the relevant documents in this case refer to her as Danielle DeHaan. For consistency this opinion refers to her only as Drebing.

[2] The predecessor to Evergreen Plaza Associations I, L.P. was Evergreen Plaza Associates Limited Partnership, and it is this entity that was actually involved in the events giving rise to this lawsuit. For simplicity this opinion refers to the two entities interchangeably as "Evergreen Plaza."

barred, Drebing was not its employee, and that she was not terminated because of her pregnancy or her sex. For the following reasons, I grant Evergreen Plaza's motion for summary judgment, but deny The Provo Group and TPG Management's motion.

I.

Summary judgment is appropriate where the record and affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Steen v. Myers*, 486 F.3d 1017, 1021 (7th Cir. 2007) (citing Fed. R. Civ. P. 56(c)). If the moving party meets this burden, the non-moving party must go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial. *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 694 (7th Cir. 2006) (citing Fed. R. Civ. P. 56(e); *Becker v. Tenenbaum-Hill Assocs., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990)). The existence of merely a scintilla of evidence in support of the non-moving party's position is insufficient; there must be evidence on which the jury could reasonably find for the non-moving party. *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). I must construe all facts in the light most favorable to Drebing and draw all reasonable and justifiable inferences in her favor. *Anderson*, 477 U.S. at 255.

II.

To determine the relevant facts I must first resolve The Provo Group and TPG Management's motion to strike the report of Jerold N. Graff ("Graff"), a certified public accountant who submitted an expert report on Drebing's behalf.  Graff's report indicates that he is a CPA and has an MBA in business administration.  He has worked for several accounting firms and has testified before state and federal courts and the Illinois Commerce Commission.[3]  Graff's report explains, in his opinion, that The Provo Group and "affiliated companies" employed at least 15 persons for at least twenty calendar weeks each in 2003, 2004 and 2005, and explains what records he reviewed and how he reached his opinion both as to the number of employees and as to how certain companies were "affiliated."

---

[3]For the first time in their reply defendants argue that Graff's report is deficient because it does not provide a list of all of Graff's publications within the past ten years, does not provide Graff's rate of pay, and does not list the cases in the past four years in which Graff has testified.  These are all required by FED. R. CIV. P. 26(a)(2)(B).  Defendants raised none of these issues in their motion to strike or in the memorandum in support of their motion, so I may consider these arguments waived.  *See Kelso v. Bayer*, 398 F.3d 640, 643 (7th Cir. 2005).  In addition, I note that Graff's report states his hourly rate, and in Drebing's response to defendants' motion she includes an affidavit from Graff listing the past cases in which he has testified.  Plaintiff states, and defendants do not dispute, that defendants chose not to depose Graff, and did not previously raise any of these deficiencies.  Within 14 days after the issuance of this opinion, Drebing shall provide defendants with any additional information necessary to comply with Rule 26(a)(2)(B).

The Provo Group and TPG Management contend that Graff's report is inadmissible because (1) it opines on an ultimate legal issue in the case, whether the employees of certain companies can be aggregated to satisfy the requirements of 42 U.S.C. § 2000e(b), and adopts the wrong legal analysis in doing so; (2) Graff is not qualified to provide his opinions; and (3) the report does not explain Graff's rationale or methodology. I conclude that Graff's report is admissible.

A.

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702. For expert testimony to be admissible under Rule 702, the movant must establish that the proposed testimony is reliable and would assist the trier of fact in understanding the evidence or determining a fact at issue in the case. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589-91 (1993). The primary purpose of Rule 702 is to avoid confusion and prevent the inclusion of unreliable expert testimony. *See id.* at 592; *Loeffel*

*Steel Prod., Inc v. Delta Brands, Inc.*, 372 F. Supp 2d. 1104, 1110 (N.D. Ill. 2005). Nevertheless, "The rejection of expert testimony is the exception rather than the rule, and the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *Spearman Indus. v. St. Paul Fire & Marine Ins. Co.*, 128 F. Supp 2d. 1148, 1150 (N.D. Ill. 2001) (quotation omitted). Cross examination and the presentation of contrary evidence are the "traditional and appropriate means" of attacking expert testimony. *Daubert*, 509 U.S. at 596 (citing *Rock v. Arkansas*, 483 U.S. 44, 61 (1987)). Drebing bears the burden of establishing the admissibility of Graff's expert opinion by a preponderance of the evidence. *See, e.g., TRW Title Ins. Co. v. Sec. Union Title Ins. Co.*, 890 F. Supp. 756, 758 (N.D. Ill. 1995).

B.

Defendants' main argument in opposition to Graff's report is that Graff's testimony improperly opines on an ultimate legal issue in the case and conflicts with the relevant legal standard. Whether Drebing can establish Title VII's employee numerosity requirement is an issue in this case. Only employers who have "fifteen or more employees for each working day in each of twenty or more calendar weeks" during the year of or the year immediately preceding the discrimination about which a plaintiff complains are "employers" covered by the requirements of Title VII. 28 U.S.C. § 2000e(b). The Seventh Circuit has explained that there are certain

circumstances under which a court may aggregate the number of employees in affiliated corporations in order to apply the 15 employee requirement. *See Papa v. Katy Indus., Inc.*, 166 F.3d 937, 940-942 (7th Cir. 1999). These exceptions include when (1) the "traditional conditions" are present for piercing the corporate veil, *id.* at 940-941 (citations omitted); (2) a corporate entity has divided itself into a number of entities with fewer than the statutory minimum number of employees "for the express purpose of avoiding liability under the discrimination laws," *id.* at 941; and (3) where a parent corporation directs the "discriminatory act, practice, or policy of which the employee of its subsidiary was complaining," in which case the parent corporation is the violator as long as the aggregate number of employees of the subsidiary and the parent meet the statutory requirement. *Id.*

Defendants first argue that Graff's report improperly opines about whether the requirements for one of these exceptions is met, and therefore improperly opines about an ultimate legal issue. As Drebing argues, however, under Federal Rule of Evidence 704 expert testimony is not objectionable simply because it "embraces an ultimate issue to be decided by the trier of fact." Drebing contends that Graff's testimony embraces the issue of whether defendants meet one of the exceptions articulated in *Papa*, but is directed more broadly at the factual question of whether defendants were Drebing's employers under the "payroll method" set forth in

*Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 206-07 (1999)

(holding that an employer has an employment relationship with a particular individual on a particular day if the individual appears on the employer's payroll for that day, not if the individual actually performs work for the employer that day). I agree. While Graff may not provide expert testimony about whether, ultimately, defendants meet any of the exceptions set forth in *Papa*, it is appropriate for him to provide forensic accounting analysis of whether Drebing is an employee of defendants and, in that examination, whether as a factual matter the defendant entities are somehow intertwined. This is what his report does. His opinions are relevant for determining the ultimate issue, which is whether defendants meet the criteria set forth in *Papa* for aggregating the number of employees of defendants in certain circumstances.[4]

Second, defendants contend that even if Graff's report does not improperly opine about an ultimate issue of law, it adopts an improper analysis of whether the defendants are "affiliated" that is contrary to the law as set forth in *Papa*. Again, I disagree. Graff's report explains how he reached the conclusion that certain

---

[4]In their reply defendants make the related argument that Graff is no more qualified to analyze the relevant documents than the court is, and so his proposed testimony is improper. *See, e.g.*, *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003). However, I disagree. As a CPA and an expert with experience in analyzing corporate documents, Graff's analysis of the evidence in this case is appropriate expert testimony and does not infringe this court's role in analyzing the law and the ultimate finder of fact's role in assessing the facts.

entities were "affiliated;" as the report explains, Graff analyzed financial statements, annual meeting minutes, corporate resolutions, and other corporate documents in order to determine that Bruce Provo ("Provo") and The Provo Group controlled the other eleven companies identified in his report (which include the other corporate defendants in this case). Defendants note that "control" is not one of the three exceptions to the 15-employee rule identified in *Papa*, and contend that Graff's report is therefore irrelevant. If anything, the fact that Graff does not ultimately opine on any of the three exceptions set forth in *Papa* demonstrates why his report does not improperly opine on an ultimate issue. That Graff determines that The Provo Group and Provo "control" the other defendants is an element for the determination of whether any of the *Papa* exceptions do apply; it is relevant to determine if veil-piercing is appropriate, if defendants have deliberately separated themselves into separate entities, and whether a parent corporation made the allegedly discriminatory decisions. *Papa*, 166 F.3d at 940-41. It is not the entire inquiry, but it is relevant. Therefore, this is not a basis to exclude Graff's report.[5]

---

[5]Defendants note in their reply that it would be improper for Graff to opine about Provo's "state of mind" and his intent in structuring the various defendant entities as they are structured. This is true, but Graff's report does not opine about Provo's state of mind. It is appropriate for Graff to reach certain conclusions which may highlight circumstantial evidence of Provo's intent.

Defendants' other objections are easy to resolve. Defendants contend that Graff is not qualified as an expert because he has never provided an expert opinion about aggregation issues or about the inquiry under *Papa*. I agree with Drebing that this is irrelevant. His report indicates, and defendants chose not to depose Graff to present evidence to the contrary, that he is a well-qualified CPA who has provided expert testimony about other forensic accounting issues. He is qualified to review corporate records and financial documents and draw conclusions about corporate governance from them. It does not matter that he has never specifically opined about the types of issues present in this case.

Second, defendants contend that Graff only provides a "bottom-line" conclusion and does not identify his entire rationale. Graff's report belies this conclusion. He specifically discusses each document he examined and explains how, in his opinion, the document demonstrates that The Provo Group or Provo exercised control over a particular entity. While defendants may challenge Graff's explanations, it is not true that Graff does not explain his rationales.

Finally, defendants argue that Graff has not identified the generally recognized practices or standards he uses to reach his conclusions. Defendants repeat numerous times that Graff has not

identified any violation of corporate standards or accounting practices, but he need not do so because his opinion is not that defendants have violated some accounting practice or corporate standard. His opinion is that, in his words, defendants are "affiliated" and that The Provo Group and Provo exercise some degree of control over the identified entities. It is true that Graff's report nowhere identifies the particular standards or practices that he is applying, although in his affidavit attached to Drebing's response to defendants' motion to strike Graff avers that in his professional work he regularly review the types of financial records addressed in his report and that "[t]he accounting expertise and analysis that I applied to the preparation of the report is the same type of expertise and analysis that I have regularly done in my accounting practice since 1957." Graff's explanation in his report about what aspects of the financial records he reviewed and his bases for reaching his conclusions about whether The Provo Group and Provo controlled certain entities demonstrates that his conclusions are based on reliable principles and methods. Defendants' specific disputes with Graff's analysis are appropriate subject matter for cross-examination or for argument why *Papa* does not apply in this case, but they do not render Graff's expert report inadmissible.

D.

For the above reasons defendants' motion to bar Graff's expert report is denied, and I will consider the conclusions of Graff's expert report in determining the relevant facts and in resolving the motions for summary judgment now before me.

III.

Taking the facts in the light most favorable to Drebing, the following are the relevant facts:[6]

A.  Overview of Entities at Issue in the Litigation

There are several entities at issue in this litigation, all with a connection to Provo or The Provo Group.[7]  Drebing testified

---

[6]The Provo Group and TPG Management have filed a combined motion to strike portions of Drebing's Local Rule 56.1(b)(3)(B) response to their Local Rule 56.1(a)(1) statement, and to strike portions of Drebing's Local Rule 56.1(b)(3)(C) statement. Evergreen Plaza also filed a motion to strike Drebing's Local Rule 56.1(b)(3)(C) statement of additional facts (erroneously identified in its motion as statements pursuant to Local Rule 56.1(b)(3)(B)). I have discretion whether to grant these motions.  *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 987 (7th Cir. 2001).  While I deny these motions, I will not consider any objected-to aspect of either side's briefing or statements of fact that rely on inadmissible evidence or that do not comport with the local rules.

[7]The parties also include facts concerning HOP Plaza, Inc. ("HOP Plaza"), a wholly-owned subsidiary of The Provo Group founded in 2003 to take over the operations of a shopping center tenant and prevent the existence of a "dark store" at the shopping center; and TPG Sanibel Holiday, L.C. ("TPG Sanibel"), a Florida LLC that rented property to tourists in Florida.  Neither party asserts that Drebing was an employee of HOP Plaza or TPG Sanibel, and as explained in more detail later in this opinion the employees of HOP Plaza and TPG Sanibel are not necessary to establish the minimum number of employees necessary for the defendants to be an "employer" under Title VII.

in her deposition that Provo told her that he deliberately structured his businesses to keep them small. In addition, Bruce Provo wrote an email to a then-employee stating, "There are so many things I don't have to do as an employer our size[,] like pay maternity benefits or even keep the job available. Why wouldn't I pay maternity benefits if I don't have to and most companies . . . our size don't if I didn't want to keep Mothers?"

### 1. The Provo Group

The Provo Group was established in 1985, and its business in 2004-05 consisted of real estate advisory and development services as well as accounting, rental management, and other services. In 2004-05 it had 16 shareholders and offices in Kansas City and Chicago. The Provo Group has no accountants or bookkeepers. Certain of The Provo Group's financial statements state that The Provo Group "outsources" its accounting needs to TPG Systems. Before the incorporation of TPG Systems in 1995, TPG did its own accounting-work in house through Provo.

Bruce Provo is the president of The Provo Group and one of its three directors. The Provo Group contends that in 2004-05 it employed Provo, Caroline Provo and Melissa Evans ("Evans"), but Drebing has pointed to employee earnings records, apparently from

The Provo Group, that identify six other employees, including Drebing.[8]

## 2. Evergreen Plaza

Evergreen Plaza consists of 13 partners who own the Evergreen Plaza Shopping Center (the "shopping center") in Evergreen Park, Illinois. Bruce Provo is the general manager of Evergreen Plaza. The sole general partner is TPG Financial. The shopping center has existed since 1952 with substantially the same ownership, although Evergreen Plaza was not formed until late 2005.

A property management company managed the shopping center until 2005, when Evergreen Plaza and TPG Management entered into a Management Agreement (the "Evergreen Management Agreement"). A copy of that agreement is attached as Exhibit O to The Provo Group and TPG Management's motion for summary judgment. The parties agree this agreement remained in effect until December of 2005. Under Paragraph 4 of the agreement:

> [TPG Management] will cause to be hired, paid and supervised (as either employees of [Evergreen Plaza] or as independent contractors for [Evergreen Plaza]; or direct employees of [TPG Management]; but in any event at [Evergreen Plaza's] expense) all persons necessary to provide on-site management; office personnel; maintenance and security for the Center. Such personnel will be responsible for normal and routine on-site management, maintenance and security activities usual to the operation of a

---

[8]The Provo Group and TPG Management contend that those six employees were employed by TPG Management.

> shopping center of a type comparable to the
> Center and will be under the guidance and
> overall supervisory management of TPG
> Financial, Inc. The General Partner ("General
> Partner") and not of [Evergreen Plaza] (who
> shall have no right to directly supervise such
> employees or independent contractors).  Any
> net increase in either the number of employees
> or compensation from year-to-year will be
> approved in connection with the annual
> operating budget by constituent Partners
> representing 60% of the partnership interests
> of [Evergreen Plaza].

The parties agree that the Evergreen Management Agreement mirrored Evergreen Plaza's agreement with the previous property manager, Rubloff, Inc. ("Rubloff"), and that under the agreement with Rubloff "anybody in the office was a Rubloff employee and was reimbursed by the partnership."  The parties agree that the Evergreen Management Agreement requires TPG Management to perform human resources and payroll functions for Evergreen Plaza employees.

Under Evergreen Plaza's partnership agreement, attached as Exhibit P to The Provo Group's motion, 60% of the partners had to approve certain transactions including leases over 25,000 square feet and contracts in excess of $10,000.  As part of her job duties Drebing prepared, issued, and calculated partner approvals.  After the original president of TPG Management left the company, Provo became the president, and was the president and director in 2004-05.

In 2004-05, Evergreen Plaza claims that it employed security guards and engineers and contracted with a vendor to provide maintenance services.[9] The vendor who provided maintenance services retained the right to discipline its own employees. Although Provo testified that his responsibility as the general manager of Evergreen Plaza was limited to obtaining tenants and making business deals, and that he only supervised Howard Reinheimer ("Reinheimer"), Dale Reaska ("Reaska") and John Drent ("Drent"), Drebing has presented Evergreen Plaza memoranda to Drebing from Reinheimer, seeking Drebing's approval of Reinheimer's personnel decisions. Reinheimer and Drent worked in the Evergreen Plaza building, while Drebing worked in an office building adjoining the Evergreen Plaza shopping center. Defendants contend that Drebing was not identified on any 2004 Evergreen Plaza payroll worksheets, payroll registers, or quarterly employee earnings records, but Drebing has presented documents entitled "Personnel Change Report" and "Employee Earnings Record" from Evergreen Plaza appearing to identify Drebing as an Evergreen Plaza employee. However, Drebing admits that she did not participate in Evergreen Plaza's 401(k) plan. While Evergreen Plaza asserts that Evergreen Plaza employees were subject to Evergreen Plaza's own employee

---

[9]Drebing contends, pointing to Paragraph 4 of the Evergreen Management Agreement, that this was impossible. Drebing also contends that it was impossible for Evergreen Plaza employee Howard Reinheimer to hire, fire, supervise and reprimand Evergreen Plaza employees as he and others claim he did.

handbook, procedures, benefit plans, health insurance, etc., Drebing contends that she was an Evergreen Plaza employee and was not subject to these documents. Drebing states that she worked on Evergreen Plaza management matters for ninety percent of her time. None of the parties present any information on the number of Evergreen Plaza employees for the relevant time period.

### 3. TPG Financial/TPG CEO

TPG Financial, Inc. ("TPG Financial") and TPG CEO, Inc. ("TPG CEO") were also wholly-owned subsidiaries of The Provo Group in 2004-05. TPG Financial was established in 1987, and was a general partner and owner representative of certain investments. TPG Financial, lacking employees, exercised its authority through Provo, its president and sole director. In 2004-05, TPG Financial was a general partner of Evergreen Plaza, and held a 1% ownership share as a general partner and a 1.922% ownership share as a limited partner.

TPG CEO was established in 1999, and has no employees. It received a monthly fee to serve as the general manager of Evergreen Plaza and to be responsible for supervision of employees and the physical property. Prior to 2004, "by and through TPG CEO," Provo became general manager of Evergreen Plaza and assumed the title of "managing general partner."

4.  TPG Management

TPG Management is a real estate management company whose primary business is managing property pursuant to management agreements.  It was created in 1988, and in 2004-05 it was a subchapter S corporation and a wholly-owned subsidiary of The Provo Group.  It managed the Evergreen Plaza Shopping Center as well as other properties.  During these years, TPG Management had six and five employees, respectively.  Bruce Provo is the sole director.  It has no payroll for employees.  It sends 96% of its revenue to The Provo Group.  TPG Management employees receive paychecks from The Provo Group.  Evergreen Plaza generally contends that TPG Management employees were subject to TPG Management's employee handbook, procedures, benefit plans, supervisors, insurance and 401(k) plans.  However, Drebing asserts that there is no specific employee handbook for TPG Management, only an employee handbook for "TPG and the Provo Companies" generally.

The parties agree that Evergreen Plaza compensates TPG Management for its duties through several different types of payments, including a "Leasing Fee," a portion of which is distributed to certain employees who have an impact on leasing and renewals. Under the Evergreen Management Agreement, TPG Management set aside a portion of its commission to distribute at its sole discretion.  This was known as the "Leasing Fund Bonus Pool," and the beneficiaries were Evergreen Plaza staff, TPG Management staff,

and the outside contractor's cleaning crews. Drebing testified that Provo handled the administration of the bonus pool. Drebing received two bonus checks from Evergreen Plaza as part of the leasing fund bonus pool. As part of her job duties for the Provo Group, Drebing calculated the leasing bonuses by dividing the pool between TPG Management, the in-house broker and the leasing fund. Drebing testified that at times Provo did not authorize the issuance of leasing fund bonuses because he "didn't like the entitlement that some employees had." Although The Provo Group contends that it expected that TPG Management employees would be paid through TPG Management funds and not through Evergreen Plaza funds, Drebing testified that she consulted Provo about which funds to use to pay the bonuses and Provo told her to use Evergreen Plaza funds.

### 5. TPG Systems

TPG Systems was incorporated in 1995. Provo was the president and a director of TPG Systems in 2004-05. It has two classes of shareholders, consisting of (1) original outside shareholders and (2) current and former employee shareholders. It has never issued stock available for public offering. According to defendants, TPG Systems is an outsource vehicle for financial services, performing accounting services for real estate management companies. TPG Systems prepares the accounting for various entities managed by Provo. However, Drebing's expert Graff opined that TPG Systems

18

spent very little on office supplies and rent, and spent nothing on marketing. In 2003 and 2004, over 99% of TPG Systems' income was provided by companies controlled by Provo or The Provo Group. Setting aside Drebing's arguments concerning aggregation, in 2004-05 TPG Systems employed eight and six employees, respectively.[10] In her deposition Drebing testified that she had no personal knowledge of TPG Systems' business and did not know if she had performed any work for it.

## B. Danielle Drebing

Defendants and Drebing dispute by whom Drebing was employed. Although The Provo Group and TPG Management contend that Drebing was hired in 1997 by TPG Management and, in 2004-05, worked for TPG Management, Drebing testified in her deposition that none of her paychecks came from TPG Management. She also points to The Provo Group and TPG Management's answer to her complaint in which they admitted that Drebing was employed by The Provo Group between March of 1997 and April 26, 2005, worked for the Provo Group as an Office Manager at the time she was terminated, and had also worked as an Administrative Assistant and Retail Tenant Service Coordinator. Drebing participated in The Provo Group's 401(k) and healthcare benefits plans. She also received paid vacation, sick time,

---

[10]The Provo Group and TPG Management contend, without any specific objection from Drebing, that one of these employees was Provo, and another three of those eight employees who worked in 2004 did not work for more than twenty weeks.

maternity leave and an annual holiday bonus from The Provo Group. Drebing asserts that she was hired by The Provo Group and that after late 1999 or early 2000, she worked directly for Provo and was assigned management duties for the shopping center. In her view, she was in one sense an employee of Evergreen Plaza as well given that Evergreen Plaza delegated supervision of its employees to TPG Management under the Evergreen Management Agreement. She further testified that her business cards indicated she worked for the shopping center, Evergreen Plaza's principal asset.

Drebing performed job duties for more than one entity, working as office manager, executive assistant, human resources manager, and retail tenant services coordinator. Drebing supervised one receptionist, sent letters to and communicated with tenants, and as an administrative assistant was charged with providing assistance to others in the office including Provo. She was promoted to office manager in 1998, and her duties in that position included performing payroll and health insurance benefits for Evergreen Plaza employees and administering 401(k) contributions for Evergreen Plaza employees. Drebing did not handle 401(k), health benefits, or payroll issues for The Provo Group. As retail tenant services coordinator, Drebing's duties included acting as a tenant liaison for shopping center tenants, dealing with tenant problems, and performing tenant economic evaluations. Provo was not in the Evergreen Plaza office for more than 30 hours a month and Drebing

agrees that he never had more than 3 hours a month of "face-to-face" time with her.

Drebing reported directly to Provo. Around November 26, 2000, Drebing received a memo from Provo in which Provo criticized her receipt of "Leasing Participation Incentives." Drebing also received other correspondence from Provo discussing compensation issues and "adding value." Drebing received a performance review in September of 2001. Provo completed the supervisor's review portion of this review. Drebing received another performance review in September of 2002. She considered both of these to be good reviews even though ten of thirty areas in her September 2001 review were marked "needs improvement" and six out of thirty areas in her September 2002 review were marked "needs improvement." Drebing further testified that she never saw her 2004 review until her deposition in this case, and she never met with Provo to discuss this review.

Drebing became pregnant in 2003, took paid maternity leave in early 2004, and gave birth in February 2004.[11] Provo granted Drebing's request for maternity leave. Before taking maternity leave Drebing asked for a reduced working schedule with reduced pay, which she received, and she thanked Provo for the flexible schedule. Drebing accepted a switch to an hourly position; she was

---

[11]The parties provide no indication of exactly how much leave Drebing took, but the facts suggest she took at least from the time she gave birth in February until April 17, 2004.

paid $42,500 a year (at $26.87 an hour), which was slightly more than 80 percent of her previous annual salary of $50,000. Drebing disputes Provo's account that he believed she had a sense of "entitlement" by originally requesting that she be allowed to work only four days a week at the same pay as before. Although Provo testified that when Drebing's schedule was reduced her workload was similarly reduced, and other employees had to cover for her, Drebing testified in her deposition that she accomplished all the same work she performed prior to her reduced schedule, and was actually given additional responsibilities.

Drebing testified that she returned from her maternity leave about April 17, 2004. When she returned, a hand-written letter from Provo was waiting for her. The letter stated in part:

> During your review, there were a few issues that I felt had the potential for unnecessary angst at your stage of pregnancy. The primary issue was the palpable tension throughout the office . . . . This is not my desired environment nor the tone I set to maximize productivity. Like the [illegible] thing, no one has the right to behave in such a manner that affects the efficiency and effectiveness of our business operations . . . even subtly.
>
> My suspicions were confirmed during your leave. The office was happier, calmer, and less confrontational both internally and externally. Even the [illegible] office (on an unsolicited basis) recognized a positive difference. All recent positive characteristics of the office have promoted greater productivity and cooperation.
>
> I believe your unpredictable moods, overreactions, limited patience and other

unproductive behaviors creates "negative energy," much tension and just a lot less fun office. No one has the right to contaminate the atmosphere of one of our offices. You need to figure out how to display a demeanor that is consistent and productive for all parties.

. . .

I am always baffled when I am extraordinarily patient with someone's mistakes and foibles, but the same person won't turn around and demonstrate the same patience with others. The bottom line is you should treat people the way you want to be treated. It's that "Golden Rule" thing.

I want a team that works well together and not at cross purposes. Like the coach of a team, I'm looking for players that perform within my system (not theirs) and compliment and promote team chemistry. Like the old saying goes . . . "there is no 'I' in team."

Welcome back to the team, but be advised that no player is bigger than the team when it comes to my desire for positive chemistry.

. . .

Danielle, you have a lot to be grateful for with the arrival of Noah and some predictability with your other responsibilities. You'll find life much easier if you strive to be happy (or at least put on a happy face) and a helluva lot more enjoyable.

Drebing testified that she was "devastated" by this memo and cried when she read it. She testified that Provo had never before asked her to appear more happy, and that she viewed this memo as Provo's attempt to encourage her to voluntarily quit her job. She further

testified that she tried to address these issues by working hard and not talking to the other women in the office.[12]

Drebing also testified that Provo made derogatory comments related to her pregnancy. She testified that Provo said that "he had to pay" her for maternity leave "without even working for it" and that she "had an entitlement problem with maternity leave." In addition, although defendants contest this, Drebing testified that Provo once told her that "he should no longer allow women to work for him because women who have babies lose too many brain cells to continue to work." She testified that she could not recall when the comment was made, except that it was made at lunch at some point before she was pregnant. This comment was made several years after an article was circulated in the office that discussed how pregnant women lose brain cells. The article was brought into the office by a female employee and circulated by Provo through the organization's "chron", a bound booklet of correspondence sent out to several offices. Drebing believed Provo circulated it because it had his handwriting on it. Another employee also testified that she saw the article with a post-it note on it with a handwritten comment from Provo.

---

[12]Drebing testified that certain female employees had "issues" with her, made negative comments about her to Provo, and "went out of their way to convolute stories of how much better it was" in her absence.

Drebing testified that after she returned from maternity leave, her working environment was hostile (although she continued to receive quarterly performance bonuses approved by Provo).[13] She testified that Provo spoke with her less about business matters than before her maternity leave, and that Provo never gave her any compliments about her work. Provo sent Drebing several negative emails. On April 27, 2004, Provo sent Drebing an email telling Drebing that she should not be working through her lunch. This email also mentioned a situation he had with an independent contractor who developed a sense of "entitlement."[14] When Drebing went to a four-day a week work schedule, she sometimes worked an extra hour by working through her lunch hour. Although she did this to show Provo that she was dedicated, this resulted in a problem because Provo did not want to pay her for working extra hours once she began working on an hourly basis. Provo testified that he viewed Drebing's working extra hours as "pushing the envelope" and taking advantage of her employer.

On April 30, 2004, Provo sent Drebing another email. The email began by discussing Drebing's recent evaluation and then

---

[13]Drebing further admitted that she cannot recall any time that Provo criticized her in front of other employees after her return from maternity leave.

[14]In this same email Provo also wrote, "Somewhat confusing to me is what value we got for maternity compensation or if that was merely an entitlement."

included a section labeled "Random Thoughts and Questions."  This
section stated, in part:

> Our compensation analysis tried to demonstrate
> that there were more costs to maternity leave
> than absolute dollars.  How about others [*sic*]
> time spent on matters you would otherwise
> handle.  Should they be expected to get their
> work done too?  If they should, then in theory
> both jobs can be done by one person.

Provo testified in his deposition that he wanted to convey to
Drebing that providing maternity leave required additional costs
related to temporary workers, which in his experience other
employees were surprised to learn.

Over time, because she received no discipline or further
complaint from Provo, she temporarily believed she had resolved all
of the issues Provo had raised, and drafted a handwritten note to
Provo thanking him for her flexible schedule and stating, in part,
"Glad we got through this."

However, about a year later there were still issues.  Provo
testified that workers were allowed to take personal and sick leave
on the "honor system" before actually accruing the leave as long as
they did not go over their allotted time for the year in question,
but that workers were not paid for unused vacation.  Drebing
testified, however, that it was the practice in the office for
workers to be paid for unused vacation, and that The Provo Group
never actually charged employees for unearned but taken personal
and sick leave.  Despite this, on April 25, 2005, about a year

after Drebing returned from maternity leave, Caroline Provo emailed Drebing and informed her that Drebing had used up all of her sick and personal leave for the year and that her paycheck would be reduced by the additional 19.5 hours she had taken; Caroline Provo directed any questions to "BAP." Drebing responded to this email by writing, in relevant part:

> I'm totally confused and was going to discuss this with him today but wasn't able to. I've been over before (in prior years) on one column and was able to deduct from overage on another so I'm totally confused by his note. I never thought we were allowed or could go over more than what was allotted in each year so if we went over in the personal hours then it would be deducted from vacation?? I guess if you are entering today then I will have to get gouged. Thanks for letting me know.

The next day, Drebing had a "contentious" meeting with Provo about her purported overuse of leave time. Provo and Drebing gave very different accounts of the meeting in their respective depositions. Provo testified that he asked Drebing into his office to discuss her email, and that Drebing became "defiant" and said, "Well, you're gouging me." Provo asked her rhetorically whether he had gouged her when he had provided her with bonuses, allowed her to work a reduced schedule, and provided her paid vacation and maternity leave. According to Provo, at some point he had the following exchange with Drebing:

> [S]he says, "Are you firing me?" I said, "No." She says, "I think you're firing me." I said, "No." She says, "Are you firing me?" I said, It sounds like you want to be fired,

27

> like you want me to fire you." And she didn't
> answer that question. She just said, "Are you
> firing me?" I go, "Okay, you're fired." So
> she got – apparently she must have gotten the
> word she wanted out of me but she taunted me.
> She taunted me and she pushed my buttons good.

Provo went on to testify that it was his belief that Drebing wanted to be fired.[15] He also testified that he had not considered terminating Drebing before the beginning of the meeting.

Drebing's account is very different. She testified that when she was called into Provo's office Provo asked her if he had "gouged" her. Drebing testified that she believed that Provo was offended by the term "gouged" in her email. She concurred with Provo's deposition testimony that he had brought up the fact that Drebing was paid benefits, bonuses, and maternity leave. Drebing testified that she responded to Provo's question of whether Provo was gouging her when he provided these benefits by stating that "these were all things. . . that were negotiated. . . And if he didn't like them, then he didn't have to agree to them." She testified that Provo "was just stomping papers around and banging his fists against the desk and just said, well, I think you'd be happier finding something else." Drebing responding by asking,

_____

[15]Included in defendants' exhibits is an email string between Drebing and another individual on March 8, 2005, discussing a job opportunity. Drebing's affidavit attached to her response to defendants' motion for summary judgment states that she was not actively looking for another job prior to being fired, but that "if and when other job prospects were made known to me, I would not rule them out and would at least consider them."

"[S]o you're firing me?" and Provo responded "Yes." Drebing testified that then Provo

> asked me what I wanted to do, if I wanted to
> stay for the rest of the week or the day. And
> I said, whatever you want. And he said, well,
> just go. And I said, well, do you want me to
> finish my payroll and my month end for 401(K).
> And he said, yes, and then leave.

In The Provo Group's answers to Drebing's interrogatories, The Provo Group stated:

> A number of factors contributed to the
> decision to terminate Ms. Drebing, including,
> but not limited to, her gross insubordination,
> her incompetence, failure to perform her job
> duties and her negative, rude and hostile
> attitude toward co-workers, vendors and rental
> property tenants. In particular, Ms.
> Drebing's inability to understand her misuse
> of personal time and her attempts to work more
> hours than allowed on a daily basis also
> factored into the decision to terminate.
> Further, on the date she was terminated she
> acted in an unprofessional and insubordinate
> manner to Bruce Provo. Prior to this date,
> Ms. Drebing's negative, rude and hostile
> attitude toward her co-workers was negatively
> impacting employee morale and upset vendors
> and rental property tenants. . . . Bruce Provo
> made the ultimate decision to terminate Ms.
> Drebing after having reviewed the concerns of
> several of Ms. Drebing's co-workers.

### C. Other Employees

The parties have submitted some evidence relating to other women who worked for The Provo Group. Drebing admits that Lynette DeRose ("DeRose") and Amy Rayle ("Rayle")were both "working mothers" when they were employed by The Provo Group, and that DeRose had two children while employed by The Provo Group.

29

Two other former employees of The Provo Group who took maternity leave during their employment also provided deposition testimony in this case. Misty Spilker ("Spilker") was an executive assistant who worked in the Kansas City office. She was described as "the brightest light in the office." She testified that she resigned from her employment at the end of her maternity leave in 2000 because in the few months before she took her leave her work environment became very "stiff and mechanical" and Provo, although professional, became "angry." She had a meeting with Provo in August of 2000 to discuss her workplace options and, although she wanted a salary or results-based position on a full-time basis, Provo only offered her part-time work. A few days after her meeting with Provo, Provo gave Spilker a memo that stated, in part:

> As I indicated last week, I need to evaluate the cost of the "maternity benefit" to the company. . . and the [illegible] or appropriateness of amortizing such costs against future wage expectations. They certainly are illuminating. . . . Please understand that your pregnancy is your problem, not mine. . . . and although we might propose an accommodation part-time (not company's 1st choice) . . . you certainly should consider your options. Perhaps Richard can figure out a way for you to stay home full time. . . . Looking for a compensation increase when I know and expect that job won't be first priority - child should and will be primary focus. Can't plan their illness nor the "worry" at the office . . . reduces focus and productivity. The same way focus and productivity has been compromised during pregnancy (while still being fully compensated). . . . What is the consideration (compensation) for change in priorities

> (during pregnancy and after birth) . . .
> flexibility etc. - trade-offs!! . . . . Salary
> would make company the "shock absorber" for
> uncontrollable situations with children . . .
> and there will be. . . . Do I (or the company)
> get rebates on wages for short term memory
> loss, morning sickness, diminished focus? Are
> these reasons to reward the future with
> significant increases?

Spilker testified that Provo refused to discuss this memo with her. She later submitted a resignation letter rather than return from leave because she could not agree on a post-leave work schedule, and she was unsure about what would happen upon her return from work.

Evans, another former employee, worked in the Kansas City office of the Provo Group from November of 1999 until her resignation on October 15, 2005, at the end of her maternity leave. She testified that after she had learned and told others of her own pregnancy, she went to lunch with Provo and two other employees. During the lunch, Provo purportedly told Evans, "I told Misty not to make her pregnancy my fucking problem." In June of 2005, Evans met with Provo and discussed her duties and who would be handling them while on maternity leave. She felt she had an agreement with Provo that she would return after her leave. She later learned that Provo had told certain tenants that another employee was taking over some of her responsibilities. She felt her working relationship with Provo deteriorated during the late stage of her pregnancy. While on maternity leave from The Provo Group, Evans

was on the payroll of a new employer.  Evans testified that she did not return from leave because she wanted a full-time job with full-time pay and she did not believe she would have a full-time job upon her return from leave.  She also testified that Drebing and Spilker's leaving The Provo Group had an effect on her decision because she did not want to receive a negative letter from Bruce Provo like they had received upon their return from maternity leave.

### D.  Drebing's EEOC Charge

On July 1, 2005, Drebing filed a charge with the Equal Employment Opportunity Commission ("EEOC").  The EEOC charge named The Provo Group as her employer, and alleged discrimination based on sex.  In the section of the charge allowing Drebing to state the particulars of her complaint, Drebing stated:

> I.  I began working for respondent in March 1997.  My most recent position was of Office Manager, Property Manager, Executive Assistant, and Human Resources Manager.  Since April 09, 2004 through April 26, 2005 I was subjected to constant derogatory comments because of my pregnancy.  On April 26 2005 I was discharged from my employment with Respondent.
>
> II.  I believe that I have been discriminated against because of my sex, female (pregnancy), in violation of Title VII of the Civil Rights Act of 1964, as amended.

Drebing received a notice of right to sue letter on June 26, 2005.  The present lawsuit followed.

IV.

Evergreen Plaza's motion for summary judgment contends that it is entitled to summary judgment because Drebing did not name it in her EEOC charge, and alternatively argues that her claim is time-barred, that it is not Drebing's employer, and that Drebing was not discharged because of her pregnancy or her gender. Analytically it makes sense to first address whether, taking the facts in the light most favorable to Drebing, Evergreen Plaza was her employer. I conclude that it was not.

Setting aside certain exceptions discussed later on in this opinion, it is true, as Evergreen Plaza argues, that Drebing must prove that Evergreen Plaza is her employer in order to maintain a Title VII action against it. *See, e.g.*, *Alexander v. Rush N. Shore Med. Ctr.*, 101 F.3d 487, 492 (7th Cir. 1996) (citations omitted). The Seventh Circuit has approved analysis of the follow factors in order to determine whether an employee-employer relationship exists:

> (1) the extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work, (2) the kind of occupation and nature of skill required, including whether skills are obtained in the workplace, (3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations, (4) method and form of payment and benefits, and (5) length of job commitment and/or expectations.

*Ost v. W. Suburban Travelers Limousine*, 88 F.3d 435, 438 (7th Cir. 1996) (citing *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 378-79 (7th Cir. 1991)) (applying test to determine whether plaintiff was an employee or an independent contractor); *see also Hojnacki v. Klein-Acosta*, 385 F.3d 544, 549 (7th Cir. 2002) (citations omitted) (applying same test to determine whether plaintiff was a government employee for purposes of due process claim). The "employer's right to control is the most important factor when determining whether an individual is an employee" as opposed to an independent contractor. *Knight*, 950 F.2d at 378.[16]

Here, even taking the facts in the light most favorable to Drebing, Evergreen Plaza did not have an employer-employee relationship with her. Drebing contends that Evergreen Plaza was her employer by virtue of the Evergreen Management Agreement, in which Evergreen Plaza voluntarily gave up its right to supervise "all persons necessary to provide on-site management." Drebing's paychecks came from The Provo Group and she participated in The Provo Group's benefit plans, but she did 90 percent of her work for Evergreen Plaza. It is true that, taking the facts in the light most favorable to Drebing, under the Evergreen Management Agreement Evergreen Plaza delegated control and supervision over employees

---

[16]There is evidence that at least two Evergreen Plaza payroll documents list Drebing as an employee. This is not dispositive, however; the test in *Ost* recognizes that the method and form of payment and benefits is relevant but emphasizes that control carries more weight. 88 F.3d at 438 (citation omitted).

working on shopping center business, and Evergreen Plaza may have ultimately been responsible for the costs and operations of the shopping center. However, the fact remains that under the agreement Evergreen delegated its control over the employees working on the shopping center to TPG Financial and TPG Management. In *Hojnacki*, the Seventh Circuit concluded that Hojnacki was not an employee of the Department of Corrections ("DOC"). *Id.* at 552. Hojnacki signed three successive employment contracts with three separate healthcare companies who had successive contracts to provide healthcare services at the DOC facility at which Hojnacki worked. *Id.* at 550. The Seventh Circuit concluded that under the contract between the DOC and Hojnacki's employer, the employer and not the DOC had supervisory authority over Hojnacki. *Id.* at 550-51. The Seventh Circuit explained that even if the DOC had ultimate control over the employee's duties or performance, it did not have control over the manner in which Hojnacki performed her duties. *Id.* at 551 (quoting *Alexander*, 101 F.3d at 493).

The contract between Hojnacki's employer and the DOC, unlike the Evergreen Management Agreement, specifically stated that Hojnacki was an employee of her employer and not of the DOC, but the reasoning of *Hojnacki* still applies here. Even if Evergreen Plaza had some ultimate control over Drebing's job and performance, it did not have control over the manner in which she performed her duties. Evergreen Plaza's contract with TPG Management was no

35

different than the DOC's contract with Hojnacki's employer.  The
Seventh Circuit recognized in *Hojnacki* that it is possible for two
different entities to both have an employment relationship with an
employee, but only where both employers have the right to control
or direct an employee's performance of their work.  285 F.3d at 552
(citing *Williams v. Shell Oil Co.*, 18 F.3d 396, 400 (7th Cir.
1994); *Williams v. Grimes Aerospace Co.*, 988 F. Supp. 925, 936 (D.
S.C. 1997)).[17]

There is simply no basis to conclude that Evergreen Plaza had
a sufficient level of control over the manner in which Drebing did
her job.  Because Drebing had no employment relationship with
Evergreen Plaza, I grant Evergreen Plaza's motion for summary
judgment on this basis, and need not address Evergreen Plaza's
other arguments in support of its motion.

_____

[17]Drebing argues that there is evidence that TPG Management
exercised its authority to designate employees as it saw fit by
designating Drebing as an employee of Evergreen Plaza.  Aside from
Drebing's characterization, there is no evidence to support that
such a designation took place.  Even if Provo designated Drebing as
an Evergreen Plaza employee for purposes of doling out Leasing
Participation Incentives, this is not evidence that Evergreen Plaza
exercised any control over Drebing's performance.  There is no
evidence that Provo supervised Drebing as an employee of Evergreen
Plaza.  Drebing also points to the fact that other individuals who
were undisputed employees of Evergreen Plaza received performance
evaluations from The Provo Group just as Drebing did that were
labeled "The Provo Group, Inc. Performance Evaluation –
Professional Management" and that contained wording that those
employees gave their "best every day" to TPG Management.  Again,
however, evidence of how those employees were evaluated does not
establish that Evergreen Plaza controlled Drebing's performance.
The Evergreen Management Agreement establishes the opposite, that
Evergreen Plaza gave up any control.

The Provo Group and TPG Management's motion for summary judgment argues that they did not have enough employees during the relevant time period to trigger Title VII, and in the alternative argue that Drebing has no Title VII claim because she was terminated for insubordination. I conclude that Drebing can satisfy Title VII's employee numerosity requirement and that she can present direct evidence of discrimination

As discussed above, only employers who have fifteen or more employees for at least twenty calendar weeks during the year of or the year immediately preceding the discrimination about which a plaintiff complains are "employers" subject to Title VII. 28 U.S.C. § 2000e(b). For Drebing, the relevant years are 2004 and 2005. Here, even taking the facts in the light most favorable to Drebing, neither The Provo Group nor TPG Management had enough employees to satisfy the minimum number required by Title VII. However, as discussed above, there are specific instances in which the employees of one or more companies may be aggregated to satisfy the 15-employee minimum. *Papa*, 166 F.3d at 940-42. These circumstances arise when the traditional conditions are met for piercing the corporate veil, when a corporate entity has purposefully divided itself into a number of small entities in order to avoid liability under the discrimination laws, or when the

parent corporation directs the discriminatory act, practice or policy of a subsidiary. *Id.*

The Seventh Circuit explained in *Papa* that the purpose of the 15-employee rule is "to spare very small firms from the potentially crushing expense of mastering the intricacies of the antidiscrimination laws, establishing procedures to assure compliance, and defending against suits when efforts at compliance fail." *Id.* at 940 (citing *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1314 (2d Cir. 1995); *Miller v. Maxwell's Int'l Inc.*, 991 F.2d 583, 587 (9th Cir. 1993)). The Seventh Circuit explained that this purpose is "unaffected by whether the tiny firm is owned by a rich person or a poor one, or by individuals or another corporation" so that

> treating *any* affiliated group of corporations as a single employer of all the employees of all the corporations in the group would lead as rapidly to the destruction of tiny firms as the approach obviously rejected by Congress of applying the antidiscrimination laws to every employer, no matter how few employees he has.

*Id.* (emphasis in original).

If Drebing's suit is to survive summary judgment, she must establish that one of the *Papa* circumstances allowing aggregation is present. Taking the facts in the light most favorable to Drebing, if aggregation of the employees of The Provo Group, TPG Management and TPG Systems is appropriate, then Drebing can show that the 15 employee minimum is met; combined those entities had 15

38

employees for 25 weeks in 2004.[18]  Combined, however, The Provo

Group and TPG Management only had at most eight employees for at

least 15 weeks in either 2004 or 2005.  The third scenario outlined

in *Papa* does not, by itself, allow Drebing to meet the employee

numerosity requirement since it only allows for the aggregation of

the parent company and the subsidiary employing the plaintiff.

*Papa*, 266 F.3d at 941 (explaining that where a parent directs the

discriminatory act of which the employee of the subsidiary

complains, "the parent, provided that the sum of its employees and

those of the subsidiary employing the plaintiff exceeded the

statutory minimum, would be the violator").  There is no evidence

here that TPG Systems employed Drebing.

All I need address is whether there is evidence that the

relevant entities deliberately divided themselves to avoid

liability under the discrimination laws.  This is a question of

_____

[18]This calculation excludes Bruce Provo, since I agree with
defendants that he is not an employee for purposes of Title VII.
*See, e.g.*, *Smith v. Castaways Family Diner*, 453 F.3d 971, 980-81
(7th Cir. 2006) (citations omitted).  These numbers are taken from
Graff's expert report.  Although defendants moved to strike Graff's
report, aside from arguing Bruce Provo should not be counted they
do not dispute the accuracy of the payroll numbers he used to
calculate the number of employees for each entity for a given week.
The parties agree that The Provo Group had 2 employees for the
entire year and TPG Management had 6 employees for the entire year
except the month of December, when it had 5.  The parties also
agree that TPG Systems had six employees for much of the year, but
for 8 weeks in the spring when Kelly Ladas worked and from August
until the end of the year when Amy Rayl worked it had 7 employees.
This adds up to 25 weeks when the collective entities had 2, 6 and
7 employees respectively, for 15 employees collectively.

fact.[19]  This particular *Papa* situation has been only infrequently

analyzed in previous decisions, and most of the decisions analyzing

this factor have summarily concluded that there is no evidence that

the corporate entities at issue divided themselves to avoid

liability.  *See, e.g.*, *Worth v. Tyler*, 276 F.3d 249, 261 (7th Cir.

2001; *LaBouve v. Boeing Co.*, 387 F. Supp 2d. 845, 851-52 (N.D. Ill.

2005).  A few cases do provide some relevant criteria.  In *Walker*

*v. Marca Constr. Inc.*, No. 02 C 3285, 2003 WL 297529 (N.D. Ill.

Feb. 11, 2003), the district court granted summary judgment for the

defendant, finding there was insufficient evidence that the

defendants "intentionally diverted employees among themselves, each

remaining small enough to avoid Title VII liability."  *Id.* at *4.

In that case, the plaintiff only argued that shared employees among

the defendants established this *Papa* exception.  *Id.*  In *Atkins v.*

*JAD Hosiery, Inc.*, No. 99 C 4055, 2000 WL 988534 (N.D. Ill. July

17, 2000), the court held that because the relevant entities were

incorporated independently at various times and for an

_____

[19]Because the *Papa* exceptions have been applied in very few
cases, the Seventh Circuit has never clearly established whether
this is a question of law or a question of fact.  *Papa* itself
states that satisfying the number of employee requirement of §
2000e(b) is not jurisdictional, and suggests that perhaps the
district court in that case erred by converting a motion for
summary judgment on this basis into Federal Rule of Civil Procedure
12(b)(1) motion to dismiss.  *Id.* at 943 (citing *Sharpe v. Jefferson*
*Distrib. Co.*, 148 F.3d 676, 678 (7th Cir. 1998)).  Intent is
normally also a question of fact.  *See, e.g.*, *Lorillard Tobacco*
*Co., Inc. v. A & E Oil, Inc.*, – F.3d –, 2007 WL 2736622, at *6 (7th
Cir. 2007) (citations omitted).

understandable business purpose (distributing a particular product in various areas of the United States) there was no evidence that the entities were incorporated to elude discrimination liability. *Id.* at *4.

Taking the facts in the light most favorable to Drebing, a reasonable finder of fact could conclude that the relevant entities here are deliberately divided to avoid liability under the discrimination laws. First, obviously, are Provo's two purported admissions that he structures his businesses to keep them small and that he understands that he does not have to keep jobs available for women who take maternity leave.[20] Second is that fact that several of the interrelated companies with which Provo is associated have overlapping functions or perform work primarily for one another. TPG Systems does accounting work for The Provo Group, and 99% of its income comes from companies controlled by Provo or The Provo Group. TPG Management manages Evergreen Plaza's shopping center, another entity primarily controlled by Provo. The employees of the various Provo entities perform duties for multiple Provo companies and also have overlapping responsibilities and functions. Drebing's expert Graff opines that Provo financially controls all the relevant entities. While TPG Systems was

---

[20]Obviously this comment is open to multiple interpretations, including that Provo does not wish to discriminate against women who take maternity leave because although he has structured his businesses to keep them small he allows women who take maternity leave to return to their positions.

incorporated in 1995 and TPG Management was incorporated in 1988, this does not necessarily prevent the conclusion that they were created at that time to avoid liability. Further, while there may be legitimate explanations for the structure of the Provo-related entities, a reasonable jury could conclude that these entities are divided to avoid liability under discrimination laws. Therefore, I find that Drebing can overcome the 15-employee minimum requirement of § 2000e(b).[21]

## VI.

This leaves for resolution the merits of Drebing's claim that she was discriminated against because of her pregnancy and her sex. Drebing's complaint alleges that she was subjected to a hostile work environment as well as being discharged as a result of her pregnancy and sex. However, in her response to defendants' motions for summary judgment Drebing only asserts her unlawful discharge claim, so I only consider whether this claim survives summary judgment. I conclude that it does.

---

[21]The jury might conclude that TPG Systems is deliberately divided from TPG Management and The Provo Group to avoid discrimination laws, but TPG Management is not deliberately separated for this purpose. In this case, Drebing can argue that the third exception in *Papa* applies to allow her to aggregate TPG Management's employees with The Provo Group's and TPG Systems' employees. There is evidence that, since Provo was Drebing's supervisor and since she performed work for both The Provo Group and TPG Management, The Provo Group might have directed Drebing's removal. *Papa*, 266 F.3d at 941. There are no cases discussing whether more than one *Papa* scenario can apply in a particular case, but there is no reason that they should not.

Title VII forbids employers from discharging or discriminating against any individual with respect to "compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Under the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k) ("PDA"), the definition of discrimination "because of sex" in § 2000e-2(a) includes "because of or on the basis of pregnancy, childbirth, or related medical conditions." *Id.; see also Maldonado v. U.S. Bank*, 186 F.3d 759, 762-63 (7th Cir. 1999) (discussing reasoning behind the passage of the PDA). To establish a Title VII claim on the basis of pregnancy and/or sex, Drebing may proceed under the direct or indirect method.

Under the direct method, Drebing may "present enough evidence to demonstrate that her discharge was a result of intentional discrimination" on the basis of her sex or her pregnancy. *Maldonado*, 186 F.3d at 763 (quoting *Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 722 (7th Cir. 1998)). She may do this through direct evidence, such as an acknowledgment of discriminatory intent by defendants, or circumstantial evidence. *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). The circumstantial evidence part of the direct method has been described as a "'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the decision-maker.'" *Jordan v. City of Gary*, 396 F.3d 825, 832 (7th

Cir. 2005) (citing *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004); *Troupe*, 20 F.3d at 736). The Seventh Circuit has recognized three types of circumstantial evidence: (1) suspicious timing, ambiguous statements, or behavior toward other employees; (2) evidence that similarly situated employees were treated differently; or (3) evidence that the plaintiff did not deserve termination and that the employer's reason for termination is a pretext for discrimination. *Volvovsek v. Wis. Dep't of Agric., Trade and Consumer Prot.*, 344 F.3d 680, 689-90 (7th Cir. 2003) (citing *Troupe*, 20 F.3d at 736). The third category is substantially similar to the showing for pretext under the indirect method, except the evidence must show more than just pretext, it must show that the decisionmaker acted because of prohibited animus. *Venturelli v. ARC Cmty. Servs., Inc.*, 350 F.3d 592, 601 (7th Cir. 2002).

Defendants contend that Drebing does not have sufficient direct or circumstantial evidence that she was discharged because of her pregnancy, since the only possible direct evidence, purported comments Provo made concerning Drebing's pregnancy, were too remote in time to bear on Drebing's discharge. *See, e.g.*, *Kennedy*, 140 F.3d at 723-24 (quoting *Geier v. Medtronic, Inc.*, 99 F.3d 238, 242 (7th Cir. 1996), which stated that "isolated comments must be contemporaneous with the discharge or causally related to the discharge decision making process"). I disagree. Here,

although the comments to which Drebing points took place a year or more before her eventual discharge, they could be found to be causally related to her discharge. Taking the facts in the light most favorable to Drebing, aside from reviews which are open to some interpretation, Provo had no significant problem with Drebing or her work before she became pregnant. Drebing was allowed to take a reduced schedule but completed all of her previous work and was given additional responsibilities. When she returned, a letter from Provo was waiting for her which pretextually questioned her pre-leave work performance. In addition, Provo made certain comments including that he had to pay her for maternity leave without even working for it and that she had an entitlement problem with maternity leave. When these comments were made is unclear. Around a year before Drebing was ultimately discharged, Provo sent several negative emails to Drebing questioning the value of allowing employees to take maternity leave. Around a year later, Drebing contends that although it was the practice of The Provo Group to allow workers to take unearned and personal leave without being charged, she discovered that The Provo Group was reducing her pay by 19.5 additional hours of unearned leave she had taken. After she questioned this decision via email, Provo called her into his office and yelled at her, asking her if he was fair when he paid her benefits, bonuses and maternity leave. He then fired her.

The length of time between any documented comments about Drebing's pregnancy and her discharge do not demonstrate a temporal relationship between the two, but there is a potential causal connection. Provo stated in his answers to Drebing's interrogatories that Drebing was discharged because of insubordination in her conversation with Provo right before she was fired, as well has her incompetence, failure to perform her job duties and her negative and rude attitude toward co-workers, vendors and tenants. However, Drebing has presented evidence that many if not most of the times that Provo accused her of having a "negative attitude" related to her taking maternity leave (and benefits therefrom), and that his perception of her "negative attitude" was unfounded. Drebing has also presented evidence that Provo engaged in a year-long campaign to induce her to quit by making constant comments about her pregnancy leave and her attitude, culminating in their conversation in April of 2005 in which he terminated her. These criticisms did not begin until she began planning to take maternity leave. Further, the day before she was fired Drebing found out that suddenly a long-standing practice of allowing employees to take unearned vacation was no longer applicable to her, and that defendants had decided to dock her pay.

These comments and actions, coupled with evidence from other female employees that Provo treated them in exactly the same way

46

(even if these events were not contemporaneous with Drebing's termination), do create a convincing mosaic of circumstantial evidence that would allow a jury to conclude that Provo terminated her because of her pregnancy. Although defendants contend that it was not unlawful for Provo to question the value of paid maternity leave after observing Drebing's conduct, especially since Provo was critical of many employees, Drebing's contention that these comments show that Provo viewed those who took maternity leave as having a "negative attitude" can be direct evidence of discrimination. *See, e.g.*, *Venturelli*, 350 F.3d at 602 (7th Cir. 2003) (explaining that previous negative statements about an employee's work record, where untrue, can be direct evidence of discrimination if directly related to the employment decision). It is true that Title VII does not require defendants to provide Drebing with paid maternity leave or any leave at all, as long as Drebing's pregnancy was not the motivating factor for any adverse employment decision. *Kennedy*, 140 F.3d at 722 (citing 42 U.S.C. § 2000e-2(m); *Hunt-Golliday v. Metro. Water Reclamation Dist.*, 104 F.3d 1004, 1010 (7th Cir. 1997)). However, the suspicious timing of Provo's complaints about Drebing's attitude and Drebing's evidence that this was pretextual is sufficient direct evidence

that she was discharged because of her pregnancy to create a question of fact for a jury to resolve.[22]

                                    VII.

For the reasons stated above, I grant Evergreen Plaza's motion for summary judgment, but deny The Provo Group and TPG Management's motion. Defendants' motions to strike are denied. Defendants' motion to bar Graff's expert report is also denied but within 14 days after the issuance of this order Drebing must provide defendants any additional information necessary to comply with Federal Rule of Civil Procedure 26(a)(2) as explained in this opinion.

                                ENTER ORDER:

                                _____
                                     **Elaine E. Bucklo**
                                United States District Judge
Dated: October 11, 2007

_____

[22] In addition, Drebing has presented evidence that Wally Wilkerson, a bookkeeper for TPG Systems who was also supervised by Provo, received negative reviews from Provo for 2003 and 2004, including that he did not communicate with co-workers, did not work well with an affiliate, was a poor manager, had anger management issues, and on one instance had a verbal fight with a woman in the office. He also took a short amount of leave for medical reasons, and when he returned did not receive a memo like the one Drebing received from Provo. Further, Provo approved leave for Wilkerson even though Wilkerson had taken more leave than he had accrued at that point in time. Defendants contend that Wilkerson is not similarly situated because Drebing has not shown that Wilkerson had the same job (he was an accountant, she performed human resources tasks), took similar leave, or had a similar dispute with Provo and was not fired. Further, Provo contends that he was equally critical of Wilkerson.